# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

----------------------------------------------------- x
                                                  :

CHRISTOPHER, B.[1],                   :                   3:22-CV-01559 (MPS) (RMS)
*Plaintiff,*                       :
                                                  :

V.                                         :
                                                  :

KILOLO KIJAKAZI, ACTING        :
COMMISSIONER OF THE SOCIAL    :
SECURITY ADMINISTRATION,     :
*Defendant.*                  :
                                                  :                    JANUARY 12, 2024
                                                  :
----------------------------------------------------- x

## RECOMMENDED RULING ON THE PLAINTIFF'S MOTION TO REVERSE AND THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

This is an administrative appeal following the denial of the plaintiff's application for Supplemental Security Income ("SSI") pursuant to Title XVI of the Social Security Act (the "Act"). It is brought pursuant to 42 U.S.C. § 405(g).[2]

The plaintiff now moves for an order reversing the decision of the Commissioner of the Social Security Administration (the "Commissioner"). (*See* Doc. No. 16). In the alternative, the

---

[1] To protect the privacy interests of social security litigants while maintaining public access to judicial records, in opinions issued in cases filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), this Court will identify and reference any non-government party solely by first name and last initial(s). *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

[2] Under the Social Security Act ("the Act"), the "Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under [the Act]." 42 U.S.C. §§ 405(b)(1), 1883(c)(1)(A). The Commissioner's authority to make such findings and decisions is delegated to an administrative law judge ("ALJ"). *See* 20 C.F.R. §§ 404.929, 416.1429. The plaintiffs can appeal an ALJ's decision to the Social Security Appeals Council. *See* 20 C.F.R. §§ 404.967, 416.1467. If the Appeals Council declines review or affirms the ALJ's decision, then the claimant may appeal to the United States district court. Section 205(g) of the Act provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

plaintiff seeks an order remanding the case for further administrative proceedings.  (*Id.*).  The Commissioner, in turn, has moved for an order affirming her decision.[3]  (*See* Doc No. 18).

For the following reasons, the Court respectfully recommends that the plaintiff's motion for an order reversing or remanding the ALJ's decision be **GRANTED IN PART** and **DENIED IN PART** to the extent the plaintiff seeks remand for the payment of benefits, and the Commissioner's motion for an order affirming that decision be **DENIED**.

## I.    <u>PROCEDURAL HISTORY</u>

On June 15, 2018, the plaintiff filed an application for SSI benefits, with an alleged onset date ("AOD") of January 1, 2014.  (*See* Doc. No. 12, Certified Transcript of Administrative Proceedings, dated February 3, 2023 ["Tr."] at 550–57).[4]  The plaintiff's application was denied initially on August 5, 2018, and again upon reconsideration on September 17, 2018.  (Tr. 226, 259).  On July 18, 2019, a hearing was held before Administrative Law Judge ("ALJ") Brien Horan.  (Tr. 65–112).  Thereafter, on July 25, 2019, ALJ Horan issued a fully favorable decision, finding that the plaintiff was disabled.  (Tr. 279–85).  However, on September 16, 2019, the Appeals Council reopened ALJ Horan's decision.  (Tr. 424–30).  Upon review by the Appeals Council, on March 24, 2020, ALJ Horan's decision was vacated and the plaintiff's application was remanded for further proceedings.  (Tr. 288–292).  More specifically, the Appeals Council determined, *inter alia*, that ALJ Horan's "finding that [the plaintiff's] substance use disorder is not material to the finding of disability is not supported by substantial evidence."  (Tr. 288).  On

---

[3] When the plaintiff filed this action, he named then-Acting Commissioner of the Social Security Administration, Kilolo Kijakazi, as the defendant. (*See* Doc. No. 1). On December 20, 2023, Martin O'Malley was appointed as Commissioner of the Social Security Administration.  As such, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley should be substituted for Kilolo Kijakazi as the defendant in this matter.

[4] The record reflects that the plaintiff previously sought disability benefits in 2014, resulting in an ALJ's unfavorable determination that the plaintiff was not disabled, dated February 15, 2017.  (*See* Tr. 213, 217).  As such, at the hearings conducted in connection with the instant application for disability benefits, the plaintiff's AOD was amended to June 15, 2018, the date on which the plaintiff's application was filed.

remand, the Appeals Council instructed the ALJ to obtain additional evidence, make further evaluations as to whether the plaintiff's impairments meet or medically equal a listed impairment, and, if appropriate, make additional findings as to "whether drug addiction and/or alcoholism are contributing factors material to the determination of disability." (Tr. 290–91).

On July 19, 2021, a second hearing was held before a different ALJ, John T. Molleur, at which the plaintiff and a vocational expert testified.[5] (Tr. 33–64). On July 29, 2021, ALJ Molleur issued an unfavorable decision, denying the plaintiff SSI benefits. (Tr. 15–26). On October 5, 2022, the Appeals Council denied the plaintiff's request for review, thereby making ALJ Molleur's decision the final decision of the Commissioner. (Tr. 1–3).

On December 7, 2022, the plaintiff filed the Complaint in this pending action. (Doc. No. 1). On December 27, 2022, absent consent of the parties, this case was transferred to the undersigned for all purposes, including the issuance of a recommended ruling. (*See* Doc. No. 11). On April 3, 2023, the plaintiff filed his Motion to Reverse the Decision of the Commissioner (Doc. No. 16), along with a supporting memorandum (Doc. No. 16-1). Thereafter, on May 2, 2023, the Commissioner filed her Motion to Affirm (Doc. No. 18), along with her own supporting memorandum (Doc. No. 18-1). The plaintiff did not file a reply.

## II.    FACTUAL BACKGROUND

The Court presumes the parties' familiarity with the plaintiff's medical history, which is thoroughly discussed in the parties' briefing. (*See* Doc. Nos. 16, 18). The Court cites only the portions of the record that are necessary to explain this decision.

---

[5]  The hearing was conducted telephonically due to the extraordinary circumstance presented by COVID-19.

A.    The Plaintiff's July 19, 2021 Hearing Testimony[6]

At the plaintiff's hearing on July 19, 2021, the ALJ discussed the AOD of the plaintiff's claimed disability, which plaintiff's counsel acknowledged was June 15, 2018.  (Tr. 40).  The plaintiff began by testifying that he left school after reaching tenth grade, and that he subsequently obtained a GED.  (Tr. 41).  The plaintiff next acknowledged that he was presently incarcerated in Bridgeport following his arrest in October 2020 for "possession," and that he was unsure how long his incarcerated would last.  (Tr. 42–44).  The plaintiff testified that he had previously been incarcerated in 2009 for approximately one year, and was also in custody for "a couple of months" in 2018.[7]  (Tr. 44).  The plaintiff stated that, prior to being incarcerated in Bridgeport, he had been hospitalized on several occasions, but did not recall the precise dates.  (Tr. 44–45).

Next, upon examination by his attorney, the plaintiff testified as to his ability to work full-time.  (See Tr. 47–48).  The plaintiff explained that he had "[a] lot of things going on physically," describing torn ligaments and arthritis in his knees, a "jammed up" wrist, and problems with his back.  (Tr. 47).  The plaintiff said that his pain levels varied from day to day and that his pain was better on some days than others.  (Tr. 47–48).  The plaintiff testified that, after ten minutes of walking, he would sometimes have to stop and sit or lay down on the grass to ease the pain in his knees and back, and that he could only comfortably pick up approximately fifteen pounds due a wrist injury that had not properly healed.  (Tr. 48–49).  The plaintiff stated that it was common for him to fall, and further testified that he suffered from diabetes and kidney problems.  (Tr. 47, 49).  As to his diabetes, the plaintiff testified that his blood sugar levels had been "all over the place,"

---

[6]  The ALJ does not appear to have considered the plaintiff's hearing testimony from July 18, 2019, which was adduced prior to the Appeals Council's remand.  Accordingly, the Court declines to include an overview of that testimony.

[7]  The plaintiff later testified that he was also incarcerated in April of 2020, but "bonded out."  (Tr. 46).

but that he was not presently experiencing any lesions on his feet due to diabetic neuropathy.  (Tr. 54).

The plaintiff also described his experience being homeless.  (*See* Tr. 48–51).  The plaintiff testified that he did not sleep much because he had no place to stay at night, and that if he was not in a secure place, he would spend his nights walking the streets and/or "cat napping" on benches. (Tr. 48).  The plaintiff also stated that he had been assaulted numerous times while sleeping outside.  (*Id.*).  When asked if his homelessness made it difficult for him to keep up with his medication, the plaintiff acknowledged that, though he initially struggled making appointments, telephonic reminders from his pharmaceutical providers helped improve his access to medication. (Tr. 50).  The plaintiff further indicated that his struggles with substance abuse had been greatly improved with extensive inpatient and outpatient treatment at the "APT Foundation."  (Tr. 50–51).

Notwithstanding those improvements, the plaintiff testified that his issues with mental health persisted, despite his sobriety.  (Tr. 51).  More specifically, the plaintiff explained that he could not get motivated, and would "just lay there," unable to get up, clean, or shower.  (*Id.*).  The plaintiff attributed these difficulties to posttraumatic stress disorder ("PTSD") stemming from "living in the streets," being assaulted and witnessing the deaths of his best friend and father.  (Tr. 52).  The plaintiff further testified that he had trouble getting along with other people due to his PTSD, which caused him to stay away from people and keep to himself.  (*Id.*).  The plaintiff avoided staying overnight at homeless shelters, opting instead to live on the streets.  (Tr. 53).

Next, the plaintiff was asked whether, during the period between 2018 and 2020, he would have needed to miss days of work at a "pretty simple" full-time job.  (Tr. 53–54).  The plaintiff testified that he would miss days of work because he often "couldn't get up in the morning."  (Tr. 54).  The plaintiff also indicated that he would have a difficult time handling criticism from a

supervisor.  (*Id.*).  Later, the ALJ asked the plaintiff about his prior work experience at Panera Bread.  (*See* Tr. 55).  The plaintiff testified that while working at Panera Bread, he would sweep, mop, and take the garbage out, which did not involve any lifting due to the wheels on the mop bucket.  (Tr. 55–56).  At the conclusion of the hearing, the plaintiff testified that he was not presently using a cane while incarcerated, but suggested that he had previously relied on a cane while "on the street."  (Tr. 63).

### B.    The VE's Testimony

Vocational expert ("VE") Dale Pasculli also testified at the plaintiff's hearing.  VE Pasculli first addressed the plaintiff's prior work at Panera Bread, explaining that the plaintiff worked as a janitor (DOT 382.664-010), which requires a medium exertion level.  (Tr. 57).  Next, the ALJ presented VE Pasculli with a hypothetical involving an individual with the plaintiff's age, education, and work background, who was limited to medium work, must avoid climbing ladders, ropes, or scaffolds, and could frequently climb ramps and stairs, stoop, kneel, crouch, and crawl, while otherwise avoiding work at unprotected heights.  (*Id.*).  This hypothetical individual should also avoid tandem or other team-oriented work, and could endure only brief, incidental contact with members of the general public, and occasional exposure to extreme cold.  (*Id.*).  Lastly, the hypothetical individual was restricted to simple, routine, repetitive tasks, with only occasional decision-making or changes in the work setting.  (*Id.*).  VE Pasculli testified that an individual with the aforementioned limitations would not be able to perform the plaintiff's past work, but would be able to perform the following unskilled, medium exertion jobs existing in the national economy: (1) Hand Packager (DOT 920.587-018); (2) Auto Detailer (DOT 915.687-034); and (3) Kitchen Helper (DOT 318.687-010).  (Tr. 57–58).

Next, the ALJ presented VE Pasculli with another hypothetical involving the same limitations as the first, except with the added limitation that the hypothetical individual could only perform light work. (Tr. 58). VE Pasculli again testified that an individual with that added limitation would not be able to perform the plaintiff's past work, but would be able to perform the following jobs requiring light exertion: (1) Cleaner, Housekeeping (DOT 323.687-014); (2) Routine Clerk (DOT 222.687-022); and (3) Photocopying Machine Operator (DOT 207.685-014). (*Id.*).

The ALJ then presented VE Pasculli with another hypothetical involving the same limitations as the first, except with the added limitations that the hypothetical individual had no requirement to interact with the general public and was also limited to frequent handling and fingering with the right hand. (*Id.*). With these added limitations, VE Pasculli testified that the hypothetical individual would not be able to perform the aforementioned "Hand Packager," "Kitchen Helper," or "Cleaner, Housekeeper" jobs. (Tr. 58–59). As such, the ALJ next asked VE Pasculli to identify three jobs that would be available to the hypothetical individual, two at the medium exertion level, and one at the light exertion level. (Tr. 59). VE Pasculli identified the following three jobs: (1) Cleaner, Industrial (DOT 381.687-018) (medium exertion); (2) Bartender Helper (DOT 312.687-010) (medium exertion); and (3) Router (DOT 222.587-038) (light exertion). (*Id.*). When pressed by the ALJ, VE Pasculli appears to have acknowledged that the hypothetical individual's limitations on social interactions would not preclude the availability of the "Bartender Helper" job, which would "really [be] just more like a stockperson for a

bartender."[8]  (*Id.*).  VE Pasculli further acknowledged that a restriction to simple, repetitive tasks would limit the hypothetical individual to unskilled work.  (*Id.*).

The ALJ next asked VE Pasculli whether the hypothetical individual would be able to perform any of the aforementioned jobs if his underlying diagnoses/condition resulted in him being off task for 60 to 90 minutes per day, "over and above scheduled breaks."  (Tr. 59–60).  VE Pasculli answered in the negative, indicating that those levels of off task behavior would rule out competitive employment in the national economy.  (Tr. 60).  VE Pasculli further testified that employers generally do not tolerate a person being off task for more than ten percent of the work day, or five minutes per hour.  (*Id.*).  VE Pasculli also indicated that an absentee rate of two to three days per month would preclude all employment, as would approximately bi-monthly angry interactions with co-workers or a supervisor, requiring third-party intervention.  (*Id.*).  Lastly, the ALJ confirmed that VE Pasculli's testimony was consistent with the DOT[9], with the exception of his testimony as to off task behavior, absenteeism, and angry social interactions, which was based on VE Pasculli's professional experience due to the DOT's silence on those topics.  (Tr. 61).

VE Pasculli was also questioned by the plaintiff's attorney, Olia Yelner.  (Tr. 61–63). Attorney Yelner first asked VE Pasculli how a sit/stand requirement might implicate the availability of the jobs discussed.  (Tr. 61).  VE Pasculli indicated that the jobs discussed could not be performed in a seated position, beyond the five minutes per hour of allotted off-task

---

[8] This portion of the hearing transcript appears to include a transcription error whereby the question posed by the ALJ is not separated from the VE's transcribed testimony.  (*See* Tr. 59).  Further, while VE Pasculli appears to answer the ALJ's question in the negative, his ensuing explanation suggests that, indeed, the hypothetical individual *could* perform the "Bartender Helper" job with a limitation on social interaction.  (*Id.*).

[9] The Dictionary of Occupational Titles ("DOT") is an official publication of U.S. Department of Labor and is often relied on by VE's in steps Four and Five of the disability evaluation "for information about the requirements of work in the national economy."  *See* SSR 00-4P (S.S.A. Dec. 4, 2000) ("The regulations at 20 C.F.R. §§ 404.1566(d) and 416.966(d) provide that [the Commissioner] will take administrative notice of 'reliable job information' available from various publications, including the DOT.").

behavior. (*Id.*). VE Pasculli further reiterated his testimony that generally, employers do not tolerate a person being off task more than ten percent of the work day, or otherwise occasionally leaving work without informing a supervisor. (Tr. 62). Lastly, VE Pasculli testified that a cane requirement would be effectively work-preclusive, as all of the jobs discussed would be difficult to perform while using a cane. (Tr. 62–63).

### C.    Objective Medical Evidence[10]

#### 1.    Physical Impairments

On July 26, 2018, the plaintiff reported to the Cornell Scott Hill Health Center in New Haven, CT ("Cornell Health"), for assistance in establishing a primary healthcare provider ("PCP"). (Tr. 1921). There, the plaintiff complained of continued back, right knee, and right wrist pain. (Tr. 1920–21). The plaintiff was prescribed pain medication, and instructed to "[l]imit activity to comfort and avoid activities that increase discomfort." (*Id.*).

On September 25, 2018, the plaintiff presented to Cornell Health with complaints of continued back, wrist, and knee pain, noting that the back pain began in July 2018, and is exacerbated by activity. (Tr. 2195–96). Upon physical examination, the plaintiff was noted as having tenderness in his low back and right knee. (Tr. 2197). Thereafter, on September 27, 2018, x-rays of the plaintiff's right knee and lumbar spine were performed at Yale New Haven Health. (*See* Tr. 1614, 1621). The x-ray of the plaintiff's lumbar spine indicated no significant degenerative changes, and the x-ray of the plaintiff's right knee likewise indicated no acute fracture or dislocation and no significant joint effusion. (*Id.*). The examination of the plaintiff's right knee

---

[10] The following recitation of the objective medical evidence is based upon the plaintiff's own overview of his relevant medical records (*see* Doc. No. 16 at 4)—which the defendant has not objected to—as well as the ALJ's decision and the Court's own review of the administrative record. Additionally, the Court notes that the administrative record contains a significant amount of medical records that are either duplicative, predate the plaintiff's AOD, or otherwise are not at issue in the instant SSI application (*e.g.*, the plaintiff's extensive history of medication management). As those records are immaterial to the instant SSI application, they are not discussed herein.

did, however, reveal "mild tricompartmental joint space narrowing, suggestive of mild osteoarthrosis." (Tr. 1622).

An MRI performed on the plaintiff's lumbar spine at Yale New Haven Health on November 24, 2018 indicated "small disc protrusions at L4-5 and L5-S1" without spinal or foraminal stenosis, as well as no fracture, traumatic subluxation, or evidence of ligament injury. (Tr. 1819).

On January 10, 2019, the plaintiff visited orthopedist Dr. Richard S. Blum, M.D. at Cornell Health, and complained of back pain, numbness and tingling in his upper and lower extremities, and muscle spasms in the low back and cervical spine. (Tr. 2077). Additional imaging conducted of the plaintiff's right knee on January 31, 2019 revealed a lateral meniscal tear, as well as a chronic tear of the anterior cruciate ligament, and osteoarthritis. (Tr. 1889).

On February 5, 2019, the plaintiff presented at Cornell Health for a follow up concerning his diabetic foot care. (Tr. 2135). The plaintiff reported no new complaints, but did note that he sometimes develops a mild dorsal lateral hyperkeratotic lesion on the fifth digit of his left foot. (*Id.*). Upon examination, the plaintiff had mild pain to palpation on the fifth digit of his left foot, but otherwise demonstrated a normal gait. (Tr. 2135–36).

On February 28, 2019, the plaintiff visited Cornell Health and reported pain and instability in his right knee due to his lateral meniscus tear. (Tr. 2123). On March 8, 2019, the plaintiff again visited Cornell Health, in connection with his diabetes and joint pain. (Tr. 2117). There, the plaintiff rated the intensity of his joint pain as a seven out of ten, noted the pain as mainly occurring in his back and neck, and indicated that his back pain would get worse with activity. (Tr. 2118–19).

On April 12, 2019, the plaintiff had an initial physical therapy evaluation with Elizabeth Tomanio, PT in connection with his lumbar pain. (Tr. 2080–89). There, the plaintiff described, *inter alia*, his history of chronic mid-to-low back pain, as well as his anterior lateral, right, and left lower knee pain. (*Id.*). Upon examination, the plaintiff's range of motion showed 50% loss of flexion and extension in the back, and 25% loss of lateral flexion bilaterally in the back. (Tr. 2087). The plaintiff also demonstrated impaired strength from his lower back through both lower extremities. (Tr. 2087–88). It was further noted that the plaintiff "has pain and difficulty standing and sitting greater than one hour, ambulating greater than 1 mile, sleeping without interruption, and washing and dressing." (Tr. 2088–89).

On February 18, 2020, the plaintiff presented to Cornell Health with right knee pain and difficulty walking, with exacerbated pain when weight-bearing. (Tr. 2253). There, the plaintiff reported unsuccessful attempts at using a flexible, marking stick as a cane. (Tr. 2257). As such, the plaintiff was provided with a paper prescription for a cane, due to concerns regarding fiberglass fragments from the marking stick. (*Id.*). The plaintiff was further assessed as suffering from diabetic neuropathy, stemming from his type 2 diabetes. (*Id.*).

On April 15, 2020, the plaintiff was evaluated at Bridgeport Correction Center ("BCC"), in connection with his arrest and intake. (*See* Tr. 2271). Notes from the plaintiff's intake health screening indicate that the plaintiff had no problems with his movement and/or gait, but that he had previously suffered a broken wrist and a torn ACL, and presently suffered from diabetes. (Tr. 2272).

The plaintiff was evaluated at BCC again in October 2020, in connection with a subsequent arrest and intake. The notes from that intake health screening similarly indicate that the plaintiff

previously suffered a torn ligament in his right knee, but that he had no problems with his movement and/or gait.  (Tr. 2301–02).

On October 26, 2020, the plaintiff was again evaluated at BCC, with treatment notes indicating that he suffered from chronic knee and back pain.  (Tr. 2329).

On November 6, 2020, while in BCC custody, x-rays were conducted of the plaintiff's right and left knees.  (*See* Tr. 2390–91).  The x-rays of the plaintiff's right knee revealed mild tri-compartment osteoarthritis, but no joint effusion.  (Tr. 2390).  The x-rays of his left knee revealed mild patellofemoral degenerative joint disease.  (Tr. 2391).

## 2.    Mental Impairments

On July 10, 2018, the plaintiff was discharged from the APT Foundation's Residential Services Division ("RSD"), after being admitted on or about April 19, 2018 for treatment of his substance abuse and mental health issues (*e.g.*, anxiety, depression, and PTSD).  (Tr. 1330–31).  While at APT, the plaintiff reported, *inter alia*, "sweatiness," "shakiness," and "irritability," and further indicated that he "lacks motivation," "experiences mood swings," and "can't be in crowds." (*Id.*).  However, notes from the plaintiff's discharge indicate that the plaintiff "appeared to stabilize while in treatment, [and] was able to work on issues such as anxiety to engage more in groups and remain an active participant."  (*Id.*).  The plaintiff was also able to remain substance free during his time in treatment, and "appeared to develop coping skills for ongoing sobriety."  (*Id.*).

On August 1, 2018, at the APT Foundation, the plaintiff reported that he was suffering from periodic concentration issues, which had impacted his ability to work in the past.  (Tr. 1324).  The plaintiff further reported struggles with PTSD and depression, indicating that he had been homeless and living on the streets for a long time, and that he had seen people get killed.  (*Id.*).  The plaintiff reported suffering from nightmares and discomfort with crowds.  (*Id.*).  The plaintiff

also indicated that he last used drugs and/or alcohol in August 2017, and indeed, the plaintiff's toxicology screen and breathalyzer reports from July 26, 2018 were both negative. (*Id.*).

On August 8, 2018, the plaintiff returned to the APT Foundation for a psychiatric follow up. (*See* Tr. 1322). There, he presented as calm and cooperative, and indicated that his mood was "fine" and that he had been eating well, but continued to struggle with sleep. (*Id.*).

On August 15, 2018, the plaintiff again presented to the APT Foundation for a follow up. (*See* Tr. 1320). At this appointment, the plaintiff was described as being irritable, and reported feeling tired and hungry. (*Id.*). The plaintiff expressed frustration with obtaining his prescription medication, but otherwise reported that his mood was manageable and was assessed to be in full remission from substance abuse. (*Id.*).

On October 3, 2018, at the APT Foundation, the plaintiff generally reported a stable mood, but indicated that he noticed days when he felt better than others. (Tr. 2018). The plaintiff was observed as having a flat affect, and further reported continued abstinence from drugs with no cravings. (*Id.*).

The plaintiff visited the APT Foundation again on December 12, 2018, and indicated that he would be living in a sober house for the next two months, and was maintaining his sobriety with the assistance of intensive outpatient treatment ("IOP").

Two days later, on December 14, 2018, the plaintiff presented for a behavioral health psychiatric evaluation at Cornell Health. (*See* Tr. 2162). There, the plaintiff reported a desire to "get [his] life together after becoming clean from drugs and alcohol," and described his difficult upbringing, living homeless on the streets, and his struggles with substance abuse. (*Id.*). The plaintiff was also noted as appearing alert, cooperative, and engaged, albeit depressed and anxious. (Tr. 2166–67).

On February 1, 2019, the plaintiff presented at Cornell Health for a follow up psychiatric/medication management appointment, and reported continued low mood, isolation, lack of motivation, worthlessness, hopelessness, poor sleep, and isolated behaviors.  (Tr. 2143). There, the plaintiff was again described as alert, cooperative, and engaged, albeit with a depressed and anxious mood.  (Tr. 2144–45).

At another appointment with Cornell Health on March 12, 2019, the plaintiff reported a low mood, low energy, and lack of motivation to do things, and further indicated that that was currently homeless.  (Tr. 2111).

At his intake at BCC on April 15, 2020, the plaintiff presented as calm, cooperative, alert, and oriented.  (Tr. 2279).  The plaintiff further reported that he was homeless, and that he had not been receiving any significant treatment for substance abuse, but had previously received treatment for PTSD.  (Tr. 2272).

In October 2020, in connection with his subsequent intake at BCC, the plaintiff was described as appearing disheveled though otherwise normal, but records suggest that he had resumed using drugs and/or alcohol on a daily basis.  (Tr. 2312, 2324).  Accordingly, the plaintiff was diagnosed with severe substance dependance.  (Tr. 2313).

### D.    Medical Opinion Evidence

In connection with his assessment of the plaintiff's residual functional capacity ("RFC"), the ALJ considered the prior administrative findings set forth by the Disability Determination Service ("DDS") at both the initial and reconsideration levels, as well as the medical opinion of Saprine Gee, MS, LPC.  (*See* Tr. 24–25).  The ALJ also considered the "consultative examinations" from the plaintiff's prior 2014 disability application.  (Tr. 24).

The ALJ first considered the DDS prior administrative findings as they pertain to the plaintiff's physical and mental impairments. (Tr. 24 (citing Tr. 212–227, 245–260)). As a threshold matter, DDS concluded generally that the plaintiff's statements regarding his symptoms were only partially consistent with the available medical records, and that the plaintiff's statements as to the severity of his symptoms were "not consistent with objective findings." (Tr. 220, 253). As to the plaintiff's physical impairments, DDS found at both the initial and reconsideration levels that the plaintiff was limited to occasional lifting/carrying of up to 50 pounds and frequent lifting/carrying of up to 25 pounds, and that he could sit, stand, or walk for approximately six hours in a typical eight-hour workday. (Tr. 221, 254). DDS further found that the plaintiff did not have any postural, manipulative, visual, or communicative limitations, but that he should avoid concentrated exposure to extreme cold or hazards (*e.g.*, machinery, heights, etc.). (Tr. 221–22, 254–55).

Regarding the plaintiff's mental impairments, DDS found at the initial level that, as to his sustained concentration and persistence, the plaintiff was moderately limited only in his ability to carry out detailed instructions, maintain attention and concentration for an extended period, and complete a normal workday/workweek without interruptions from psychological symptoms. (Tr. 223). DDS further determined that, as to social interaction, the plaintiff was moderately limited only in his ability to interact appropriately with the general public and get along with coworkers without distracting them or exhibiting behavioral extremes. (Tr. 223–24). Lastly, when evaluating the plaintiff's adaptation limitations, DDS concluded that the plaintiff was only moderately limited in his ability to respond appropriately to changes in the work setting. (Tr. 224). DDS made the same conclusions at the reconsideration level, with the exception of its finding that the plaintiff was not significantly limited in his ability to carry out detailed instructions. (Tr. 256–57).

The ALJ determined that DDS's finding that the plaintiff was capable of medium work was persuasive, and afforded that finding significant weight, as it was "not inconsistent with the subsequently submitted medical evidence indicating no more than mild abnormalities." (Tr. 24).

The ALJ also specifically considered the "consultative examinations" from the plaintiff's prior 2014 disability application. (Tr. 24). However, in evaluating this evidence, the ALJ emphasized that the examinations were conducted four to five years before the plaintiff's AOD, and that they were initially considered in connection with a prior disability application in which the plaintiff was found not disabled. (*Id.*). Accordingly, in concluding that these examinations were "stale," the ALJ declined to find them persuasive, and "[gave] them little weight." (*Id.*).

Lastly, the ALJ considered a form submitted by Saprine Gee, MS, LPC, which was completed on October 7, 2019 and pertained to the "materiality of [the plaintiff's] drug or alcohol abuse." (*See* Tr. 2214). Ms. Gee determined that the plaintiff's drug addiction and or alcoholism was not his only impairment, but that his other impairment(s) are not alone "totally disabling." (*Id.*). Ms. Gee further concluded that the physical and/or mental limitations resulting from the plaintiff's other impairment(s) are exacerbated by his drug or alcohol use, and that those limitations would be disabling even if the plaintiff stopped using drugs and/or alcohol. (*Id.*). In evaluating these findings, the ALJ determined that Ms. Gee's form was not persuasive, and accordingly, did not "give it any weight." (*See* Tr. 24). More specifically, the ALJ emphasized that: (a) Ms. Gee was not an acceptable medical source, and the form does not otherwise reference or attach any supporting documentation; and (b) it is "internally inconsistent" to find that the plaintiff's drug and/or alcohol use does not exacerbate his other impairments, but also state that the plaintiff's other impairments would still be disabling even if he ceased using drugs and/or alcohol. (Tr. 24– 25).

## III.    __THE ALJ'S DECISION__

The ALJ must follow a five-step evaluation process as promulgated by the Commissioner to determine whether a claimant is disabled within the meaning of the Act.  *See* 20 C.F.R. § 404.1520(a).[11]

At Step One, the ALJ found that the plaintiff had not engaged in substantial gainful activity since his AOD, June 15, 2018.  (*Id.*).

At Step Two, the ALJ determined that the plaintiff had the following severe impairments: "status post closed fracture of distal right wrist, osteoarthritis of the right knee, obesity, diabetes mellitus Type II, posttraumatic stress syndrome (PTSD), an anxiety disorder, and a history of substance abuse."  (Tr. 18).

At Step Three, the ALJ found that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments (the "Listings").  (Tr. 18–20); *see generally* 20 C.F.R. Part 404, Subpart P, Appendix 1.  As to any physical impairments, the ALJ determined that "the overall evidence of record is insufficient to support a finding that any of the claimant's impairments rises to the level of listing level severity," and that any limitations caused by the plaintiff's obesity, either alone or in combination with

---

[11]  An ALJ determines a claimant's disability using a five-step analysis.  *See* 20 C.F.R. § 404.1520.  First, an ALJ must determine whether a claimant is currently working.  *See* 20 C.F.R. § 404.1520(a)(4)(i).  If a claimant is currently employed, then the claim is denied.  *Id.*  If a claimant is not working, then an ALJ must make a finding as to the existence of a severe mental or physical impairment.  If none exists, then the claim is also denied.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).  If a claimant is found to have a severe impairment, then the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations ("the Listings").  *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79–80 (2d Cir. 1998).  If a claimant's impairment meets or equals one of the impairments in the Listings, then the claimant is automatically considered disabled.  *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80.  If a claimant's impairment does not meet or equal one of the listed impairments, then the claimant must show at the fourth step that she cannot perform her former work.  *See* 20 C.F.R. § 404.1520(a)(4)(iv).  If a claimant shows that she cannot perform her former work, then the burden shifts to the Commissioner to show at Step Five that the claimant can perform other gainful work.  *See Balsamo*, 142 F.3d at 80 (citations omitted).  Accordingly, a claimant is entitled to receive disability benefits only if she shows that she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

another impairment, do not medically equal a Listing.  (Tr. 18).  Similarly, the ALJ determined that the plaintiff's history of substance abuse is immaterial to "any deficit in functioning as the record indicates that the claimant functioned reasonably well during the period at issue despite fluctuating substance abuse."  (*Id.*).

As to the Listings regarding mental impairments, the ALJ considered, *inter alia*, whether the "paragraph B" and/or "paragraph C" criteria were satisfied.  *See* 20 C.F.R. Part 404, Subpart P, App'x 1, § 12.00(A)(2).  More specifically, the ALJ found that the plaintiff's mental impairments did not satisfy the "paragraph B" criteria because they did not cause either at least two "marked" limitations, or one "extreme" limitation, and that, similarly, the evidence in the record failed to establish the presence of "paragraph C" criteria.  (Tr. 18–20).

Next, the ALJ formulated the plaintiff's RFC.  A plaintiff's RFC is the most that a claimant can do despite their impairments, and is determined by assessing all of the relevant evidence.  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The ALJ determined that the plaintiff had the residual functional capacity to perform:

> "medium work as defined in 20 CFR 416.967(c). The claimant can frequently balance, stoop, kneel, crouch and crawl. He must avoid work at unprotected heights. He can tolerate no more than occasional exposure to extremes of cold. The claimant must avoid tandem or other team oriented work. The claimant can tolerate no more than brief/incidental contact with the general public. The claimant is limited to simple, routine, repetitive tasks. The claimant can engage in no more than occasional decision making or changes in the work setting."

(Tr. 20)

At Step Four, the ALJ found that the plaintiff was unable to perform any past relevant work.  (Tr. 25).

As such, the ALJ proceeded to Step Five of the sequential analysis, wherein the ALJ determined, based upon the testimony of VE Pasculli, that "[c]onsidering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the

national economy that the claimant can perform." (*Id.*).  More specifically, the ALJ concluded that, during the relevant period, the plaintiff was able to perform the requirements of the following representative occupations: (1) Hand Packager (DOT 920.587-018), an unskilled position requiring medium exertion, of which approximately 152,000 jobs exist in the national economy; (2) Auto Detailer (DOT 915.687-034), an unskilled position requiring medium exertion, of which approximately 195,000 jobs exist in the national economy; and (3) Kitchen Helper (DOT 318.687-010), an unskilled position requiring medium exertion, of which approximately 343,000 jobs exist in the national economy.  (Tr. 26).

Given this finding, the ALJ determined that the plaintiff was not disabled.  (*Id.*).

## IV.    <u>STANDARD OF REVIEW</u>

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981).  The Court's function is to first ascertain whether the ALJ applied the correct legal principles in reaching their conclusion, and then whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]"  42 U.S.C. § 405(g).  *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012).  Therefore, absent legal error, this court may not set aside the decision of the Commissioner if it is supported by substantial evidence.  *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).  Substantial evidence means more than a scintilla, "[i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 400 (1971) (quoting *Consolidated Edison Co.*

*v. NLRB*, 305 U.S. 229 (1938)).  The substantial evidence standard is "a very deferential standard of review—even more so than the 'clearly erroneous' standard," and the Commissioner's findings of fact must be upheld unless "a reasonable factfinder would *have to conclude otherwise*."  *Brault*, 683 F.3d at 448 (emphasis in original) (citations omitted); *see also Wagner v. Sec'y of Health & Human Serv's.*, 906 F.2d 856, 860 (2d Cir. 1990) (when reviewing a denial of DAC, a district court may not make a *de novo* disability determination).  "[A district court] must 'consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight.'"  *Petrie v. Astrue*, 412 F. App'x 401, 403–04 (2d Cir. 2011) (quoting *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)).

"Such a deferential standard, however, is not applied to the Commissioner's conclusions of law."  *Muntz v. Astrue*, 540 F. Supp. 2d 411, 418 (W.D.N.Y Mar. 17, 2008) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).  "This court must independently determine if the Commissioner's decision applied the correct legal standards in determining that the plaintiff was not disabled."  *Id*.  "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."  *Johnson*, 817 F.2d at 986.

## V.    **DISCUSSION**

The plaintiff raises two arguments in his appeal: (1) that the ALJ erred at Step Three, in finding that the plaintiff's mental impairments failed to meet or medically equal a listing; and (2) that the ALJ erred by formulating the plaintiff's ensuing RFC while leaving out relevant factors described in plaintiff's objective medical records.  (*See* Doc. No. 16-1 at 18, 22).  In response, the

Commissioner argues that ALJ's decision is supported by substantial evidence because: (a) the administrative record does not support a finding that the plaintiff's mental impairments met or medically equaled a listing; and (b) the ALJ's RFC formulation need not be based on a medical opinion, and the ALJ was otherwise entitled to rely on the DDS prior administrative findings. (*See* Doc. No. 18-1 at 4, 10).

For the reasons set forth herein, the Court agrees in part with the plaintiff, and finds that the ALJ's "paragraph B" evaluation under the Listings is supported by substantial evidence, but that the ALJ failed to adequately develop the administrative record by neglecting to solicit medical opinion evidence relating to the plaintiff's extensive post-2018 medical treatment.  The Court further finds that the ALJ otherwise failed to comply with the regulations governing the only medical opinion evidence to which he assigned any weight.  Consequently, the Court respectfully recommends that remand is warranted to further develop the administrative record and otherwise facilitate a proper reformulation of the plaintiff's RFC.  Additionally, because this case is being remanded on other grounds, the Court declines to find whether the ALJ's "paragraph C" evaluation under the Listings is supported by substantial evidence.

In light of the foregoing, on remand, the ALJ is instructed to: (a) articulate the specific reasons for any finding that the plaintiff's mental impairments fail to meet the "paragraph C" criteria for Listings 12.06 and 12.15; (b) solicit additional, more contemporaneous medical opinion evidence that incorporates the plaintiff's post-2018 medical treatment records; (c) evaluate the preexisting prior administrative filings (as well as any additional medical opinions) in accordance with the regulations governing medical opinion evidence; and (d) reformulate the plaintiff's RFC accordingly.

A.    The ALJ's Listings Analysis

The Court turns first to the ALJ's analysis of the Listings at Step Three.  As of the AOD, the plaintiff had been diagnosed with several mental health conditions, including depression, anxiety disorder, and PTSD.  (*See* Tr. 1330–31).  The ALJ's decision acknowledges the existence and severity of the plaintiff's anxiety disorder and PTSD, but declines to find that those conditions were severe enough to meet or medically equal their corresponding listing.  (*See* Tr. 18).  The plaintiff argues that the ALJ committed "a number of serious factual errors," in determining that the plaintiff's mental impairments were, at most, "moderate," and therefore failed to meet either the "paragraph B" or "paragraph C" criteria.  (Doc. No. 16-1 at 18–22).  Instead, the plaintiff contends that the objective medical evidence in the administrative record, as well as the plaintiff's own hearing testimony, demonstrate that he meets the requirements of Listings 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), and 12.15 (trauma and stressor-related disorders).  (*Id.*).  To the contrary, the Commissioner argues that the ALJ's decision is supported by substantial evidence, and that the plaintiff has failed to meet his burden of demonstrating that his mental impairments meet or medically equal the requirements of their corresponding "paragraph B" and/or "paragraph C" criteria.  (*See* Doc. No. 18-1 at 4).  In this regard, the Court agrees in part with the Commissioner, and in part with the plaintiff.

To satisfy the requirements of Listings 12.04, 12.06, and 12.15, a plaintiff must meet the criteria of "paragraph A" *and* either "paragraph B" or "paragraph C" of the Listing.[12]

The "paragraph A" criteria for Listing 12.06 is satisfied by:

"[m]edical documentation of the requirements of paragraph 1, 2, or 3: (1) Anxiety disorder, characterized by three or more of the following; Restlessness; Easily

---

[12]  The ALJ does not address Listing 12.04 in his analysis.  Moreover, as set forth in more detail *infra* Point V(A)(1), the Court finds that the plaintiff may not challenge the ALJ's analysis—or lack thereof—as to whether the plaintiff met the requirements of Listing 12.04.  As such, the Court declines to provide an overview of how the "paragraph A" criteria for Listing 12.04 is satisfied.

fatigued; Difficulty concentrating; Irritability; Muscle tension; or Sleep disturbance; (2) Panic disorder or agoraphobia, characterized by one or both: Panic attacks followed by a persistent concern or worry about additional panic attacks or their consequences; or Disproportionate fear or anxiety about at least two different situations (for example, using public transportation, being in a crowd, being in a line, being outside of your home, being in open spaces); (3) Obsessive-compulsive disorder, characterized by one or both: Involuntary, time-consuming preoccupation with intrusive, unwanted thoughts; or Repetitive behaviors aimed at reducing anxiety."

The "paragraph A" criteria for Listing 12.15 is satisfied by:

"[m]edical documentation of all of the following: Exposure to actual or threatened death, serious injury, or violence; Subsequent involuntary re-experiencing of the traumatic event (for example, intrusive memories, dreams, or flashbacks); Avoidance of external reminders of the event; Disturbance in mood and behavior; and Increases in arousal and reactivity (for example, exaggerated startle response, sleep disturbance)."

The "paragraph B" criteria are the same for Listings 12.04, 12.06, and 12.15 and require a plaintiff to show: "[e]xtreme limitation of one, or marked limitation of two, of the following areas of mental functioning: [1] Understand, remember, or apply information; [2] Interact with others; [3] Concentrate, persist, or maintain pace; [and] [4] Adapt or manage oneself."  20 C.F.R. Pt. 404 Subpart P, App'x 1, §§ 12.04(B), 12.06(B), 12.15(B) (internal citations omitted).

Likewise, the "paragraph C" criteria are also the same for Listings 12.04, 12.06, and 12.15, and require a plaintiff to show: (1) medical documentation of the disorder for a period of at least two years; and (2) evidence of both (a) "medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of the mental disorder," as well as (b) "marginal adjustment, that is, [the plaintiff has the] minimal capacity to adapt to changes in [his] environment or to demands that are not already part of [his] daily life." *Id.* at §§ 12.04(C), 12.06(C), 12.15(C).

At Step Three, the burden of proof remains with the plaintiff to establish that he meets a Listing. *See Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) ("the claimant has the burden on

the first four steps" of the sequential evaluation process).  Nevertheless, as a general matter, an "ALJ is required to articulate the specific reasons justifying his decision that the claimant does or does not meet the relevant listing."  *Howarth v. Berryhill*, No. 3:16-CV-1844 (JCH), 2017 WL 6527432, at *5 (D. Conn. Dec. 21, 2017) (citations omitted).  "The failure to articulate reasons can itself be the basis for remand."  *Id.* (citations omitted).  "This is true when the court 'would be unable to fathom the ALJ's rationale in relation to evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ.'"  *Id.* (quoting *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982)).

### 1.    Listing 12.04

As a threshold matter, regarding Listing 12.04, the Court notes that the ALJ did not find at Step Two that depression was among the plaintiff's severe impairments.  (*See* Tr. 18).  Here, the plaintiff suggests that because he was initially found to have met the requirements of Listing 12.04—before the Appeals Council vacated that finding and remanded the plaintiff's application for further proceedings—he is entitled to the same finding now.  (Doc. No. 16-1 at 22).  The Court disagrees. Moreover, as argued by the Commissioner, the plaintiff does not challenge the ALJ's findings at Step Two of the sequential analysis, nor does he otherwise account for the fact that depression was not found by ALJ Molleur to be among the plaintiff's severe impairments, thereby limiting his ability to now argue that he has met the requirements for Listing 12.04.  Indeed, in light of the foregoing, the Court finds that the plaintiff may not challenge the ALJ's analysis at Step Three, insofar as it does not address whether the plaintiff met the requirements of Listing 12.04.

### 2.    Listings 12.06 and 12.15[13]

As to Listings 12.06 and 12.15, the ALJ found that the plaintiff's anxiety disorder and PTSD were not severe enough to satisfy either the "paragraph B" or "paragraph C" criteria.  (*See* Tr. 19).

In evaluating the "paragraph B" criteria, the ALJ first determined that the plaintiff had only a "mild" limitation in understanding, remembering, or applying information.  (*Id.*).  Indeed, the ALJ found that, while records from the plaintiff's incarceration intake do suggest a mild impairment in memory functioning, "there is no indication that the [plaintiff] has a pervasive deficit in this area."  (*Id.*).  Moreover, the ALJ acknowledged the voluminous medical records documenting the plaintiff's mental health treatment and emphasized that the plaintiff was able to keep "most, if not all, of his scheduled appointments," and that there was otherwise "no convincing evidence that [the plaintiff] required reminders from his healthcare providers over and above his care providers' normal practices."  (*Id.*).

Next, the ALJ found that the plaintiff had a "moderate" limitation in interacting with others. (*Id.*).  The ALJ accepted that the plaintiff had difficulty in social situations, was often irritable, and had reported significant anxiety.  (*Id.*).  The ALJ also emphasized the plaintiff's testimony that he would use a public bus to travel to medical appointments, as opposed to a taxi, "presumably because he wanted to avoid direct interaction with a taxi driver."  (*Id.*).  However, the ALJ further noted that, by contrast, the plaintiff "did not appear anxious or disheveled" during a clinical interview at BCC.  (*Id.*).

---

[13]  The ALJ, as well as both parties, appear to agree that the "paragraph A" criteria for both Listings 12.06 and 12.15 were met.  As such, and because these listings share the same "paragraph B" and "paragraph C" criteria, the Court will address them together.

Regarding the plaintiff's ability to concentrate, persist, and maintain pace, the ALJ determined that the plaintiff had a "moderate" limitation. (*Id.*). In so finding, the ALJ accepted that the plaintiff had difficulty sustaining focus and attention in more complex matters, and further acknowledged that, while the plaintiff's memory was impaired upon his initial arrival at BCC in 2020, it was later intact, insofar as the plaintiff was able to "provide coherent medical histories to his various care providers." (*Id.*).

Finally, the ALJ found that the plaintiff had a "moderate" limitation in adapting or managing himself. (*Id.*). Here, the ALJ accepted the plaintiff's struggles with homelessness as evidence of a "deficit in managing himself," but emphasized that the plaintiff had still been "able to access community resources, such as a homeless shelter, and public transportation." (*Id.*). Moreover, the ALJ noted that prior "mental status examinations" indicated that the plaintiff had "intact thought process and judgment," and that, in general, the plaintiff's "baseline level of functioning" was within normal limits. (*Id.*).

Having found that the plaintiff's mental impairments did not cause either two "marked" limitations, or one "extreme" limitation, the ALJ determined that the plaintiff had not satisfied the "paragraph B" criteria for Listings 12.06 and 12.15.

In light of the ALJ's detailed analysis, the Court finds that the ALJ has sufficiently articulated the specific reasons justifying his decision that the plaintiff's mental impairments fail to meet the "paragraph B" criteria. *See Howarth*, 2017 WL 6527432, at *5.

Consistent with "paragraph B," the ALJ discussed in detail the extent to which the plaintiff had limitations in his ability to "[u]nderstand, remember, or apply information, [i]nteract with others, [c]oncentrate, persist, or maintain pace, [and] [a]dapt or manage [him]self." *See* 20 C.F.R. Pt. 404 Subpart P, App'x 1, §§ 12.06(B), 12.15(B); (Tr. 19). In ultimately finding that the

plaintiff's mental impairments did not cause either two "marked" limitations, or one "extreme" limitation, the ALJ duly considered medical treatment evidence spanning the entire, voluminous administrative record, as well as the plaintiff's own hearing testimony. (Tr. 19). The ALJ acknowledged and weighed the consistency between the plaintiff's testimony and the record evidence, and further evaluated the extent to which the plaintiff's mental impairments may have fluctuated throughout the relevant period. (*Id.*). The ALJ also made appropriate inferences stemming from specific details in the plaintiff's medical treatment records, *e.g.*, that the plaintiff is able to keep "most, if not all, of his scheduled appointments," and that the plaintiff's limitation in interacting directly with others is reflected by his reported preference for public transportation, as opposed to a taxi. (*Id.*). For the foregoing reasons, the Court finds that substantial evidence supports the ALJ's finding that the plaintiff's mental impairments did not satisfy the "paragraph B" criteria of either Listing 12.06 or Listing 12.15.

Moreover, the Court emphasizes that the plaintiff argues for a substantial departure from the ALJ's decision—which failed to find even one "marked" limitation—and that, in that regard, the plaintiff certainly has not met his burden. *See Shaw*, 221 F.3d at 132. Rather, it seems that the plaintiff simply disagrees with the ALJ's rationale, which does not itself nullify the ALJ's ultimate determination.

As to the "paragraph C" criteria, the ALJ determined that the evidence in the administrative record was insufficient, and that there was "no indication that the claimant cannot function outside of a structured environment." (Tr. 19). On its face, such a conclusory finding, absent any analysis or precise support from the record, may warrant remand. *Howarth*, 2017 WL 6527432 at *5. However, a review of the "other portions of the ALJ's decision" arguably demonstrates that he thoroughly considered, *inter alia*, the plaintiff's struggles with homelessness and ability to adapt

to changes in his environment.  *See id.* ("the court is not required to remand if the ALJ's reasons can be discerned from other steps in the ALJ's analysis or from the evidence in the record.") (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)); *see also Berry*, 675 F.2d at 469 (noting that, "in spite of the ALJ's failure to explain his rejection of the claimed listed impairments, we were able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence").  Indeed, in both the "paragraph B" analysis and the RFC portion of his decision, the ALJ considered the plaintiff's reported and/or diagnosed history of homelessness, depression, anxiety, and PTSD, and the related impact that those conditions have on the plaintiff's ability to "adapt to changes in [his] environment or to demands that are not already part of [his] daily life." (*See* Tr. 19, 21–24); 20 C.F.R. Pt. 404 Subpart P, App'x 1, at §§ 12.06(C), 12.15(C).  The ALJ also gave significant weight to the DDS administrative findings, whose assessment of the plaintiff's mental impairments did not suggest that the plaintiff met the "paragraph C" criteria.  (*See* Tr. 25).

While these other portions of the ALJ's decision may permit a finding that the ALJ's otherwise conclusory "paragraph C" analysis is still supported by substantial evidence, the Court declines to make any such finding at this juncture.  As set forth *supra* Point (V)(B), the Court is already remanding this case on other grounds.  Accordingly, the Court declines to determine whether the ALJ's "paragraph C" determination is supported by substantial evidence,  and instead instructs that, on remand, the ALJ shall articulate the specific reasons for any finding that the plaintiff's mental impairments fail to meet the "paragraph C" criteria for Listings 12.06 and 12.15.

### B.    The ALJ's Assessment of the Record Evidence

The Court turns next to the ALJ's RFC formulation, which the plaintiff contends improperly leaves out various relevant factors.  More precisely, the plaintiff argues that, by relying

only on prior administrative findings which were "based on a tiny portion of the record," the ALJ necessarily arrived at the plaintiff's RFC formulation "in the absence of supported medical opinions." (Doc. No. 16-1 at 26). While framed by the plaintiff in the context of the ALJ's RFC formulation, the Court construes this argument as more accurately contending that the ALJ failed to adequately develop the record by neglecting to obtain medical opinion evidence incorporating the plaintiff's post-2018 medical records. The Court agrees with this argument, and further finds that the ALJ failed to adhere to the regulations governing medical opinion evidence.

### 1.    The ALJ's Duty to Develop the Administrative Record

As an initial matter, the Court finds that, by failing to solicit any medical opinion evidence based on the plaintiff's post-2018 medical records, the ALJ necessarily failed to adequately develop the administrative record, such that remand is warranted.

A "hearing on disability benefits is a non-adversarial proceeding," and as such, "the ALJ generally has an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citation omitted). This duty exists even when, as in this case, the claimant is represented by counsel. *Id.* (citation omitted). The ALJ's obligation to develop the record exists "when additional information is needed due to the vagueness, incompleteness, or inconsistency of the treating source's opinion." *Moreau v. Berryhill*, No. 3:17-CV-396 (JCH), 2018 WL 1316197, at *11 n.6 (D. Conn. Mar. 14, 2018) (multiple citations omitted); *see* 20 C.F.R. § 404.1520b(b)(2)(i). However, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (internal quotation marks omitted).

Here, the record contains prior administrative findings set forth by DDS at both the initial and reconsideration levels, which were conducted on August 8, 2018 and September 18, 2018,

respectively.[14]  (*See* Tr. 212, 245).  Those findings were necessarily based on available medical evidence predating August 8, 2018.  The ALJ duly considered the DDS findings, found them persuasive, and afforded them significant weight.  (Tr. 24).  The ALJ also considered a significant amount of available medical evidence from 2018 to 2020 that postdates the aforementioned DDS administrative findings.  (*See* Tr. 22–24).  For example, the ALJ thoroughly assessed the existing post-2018 records from Cornell Health and the APT Foundation, as well as the records from the plaintiff's intake(s) at BCC in 2020.  (*See id.*).  (*Id.*).  However, the ALJ neglected to solicit or otherwise obtain any medical opinions that evaluate that post-2018 evidence.  In that regard, the Court finds that the ALJ failed to adequately develop the record, and committed a harmful error.

"It is well-settled that the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion."  *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (internal quotation marks omitted); *see also Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) ("ALJ is not permitted to substitute his own expertise or view of the medical proof . . . for any competent medical opinion") (internal citations omitted); *see Manzella v. Comm'r of Soc. Sec.*, No. 20-CV-3765 (SLC), 2021 WL 5910648, at *14 (S.D.N.Y. Oct. 27, 2021), *report and recommendation adopted*, No. 20-CV-3765 (VEC), 2021 WL 5493186 (S.D.N.Y. Nov. 22, 2021) ("ALJs may not, of course, 'play doctor' by using their own lay opinions to fill evidentiary gaps in the record"); *Delgado v. Berryhill*, No. 3:17-CV-54 (JCH), 2018 WL 1316198, at *7 (D. Conn. Mar. 14, 2018) (remanding due to ALJ's failure to develop the record where the opinions in the record did not sufficiently address the claimant's limitations).  Moreover, courts in this Circuit have concluded that an ALJ fails to adequately develop the record when he "ha[s] no opinion from any medical source, treating

---

[14]  The record also contains the "consultative examinations" from the plaintiff's prior 2014 disability application.  (Tr. 24).  However, in concluding that these examinations were "stale," the ALJ declined to find them persuasive, and "[gave] them little weight."  (*Id.*).

or otherwise, as to the significance of [certain additional medical records] or their implication for [the plaintiff's] functional abilities." *Russ v. Comm'r of Soc. Sec.*, 582 F. Supp. 3d 151, 164 (S.D.N.Y. 2022).

Much like in *Russ*, ALJ Molleur's decision was founded on an administrative record with obvious gaps, namely, opinion and/or source evidence relating to medical treatment records comprising nearly the entire period of the plaintiff's alleged disability. Indeed, while the administrative record contains objective medical evidence from approximately two and a half years of treatment/evaluation, the ALJ's decision is supported by medical opinion evidence from only the first few months of that period. To the extent that opinion evidence fails to sufficiently address the plaintiff's limitations, remand is appropriate. *See Delgado*, 2018 WL 1316198 at *7.

Here, the plaintiff's post-2018 medical records include extensive notes from regular physical examinations, as well as numerous x-rays, MRIs, and other imaging of the plaintiff's knees, back, and/or wrists—evidence that was largely absent from the medical records relied on by DDS in its prior administrative findings, particularly from the period after the plaintiff's amended AOD. (*See* Tr. 217, 250). For example, DDS was unable to rely on evidence from the physical examination performed on April 12, 2019 to evaluate the plaintiff's lumbosacral spondylosis, which indicated that the plaintiff had restricted range of motion and impaired strength from his low back through both lower extremities, and otherwise had "pain and difficulty standing and sitting greater than one hour, ambulating greater than 1 mile, sleeping without interruption, and washing and dressing." (*See* Doc. No. 16-1 at 27 (citing Tr. 2088–89)). Likewise, DDS could not have relied on "the treatment notes from the many visits that [the plaintiff] had for his multiple areas of chronic pain," or the MRI evidence of a lateral meniscus tear, a chronic tear through the

anterior cruciate ligament, and osteoarthrosis in the plaintiff's right knee.  (*Id.* at 25, 27 (citing Tr. 1889)).

Evidently, the ALJ concluded that these post-2018 records did not warrant any change in the prior DDS findings, which he afforded significant weight.  However, without any opinion evidence supporting that conclusion—and filling an obvious gap in the record—the ALJ necessarily substituted his own medical opinion, which is impermissible.  As such, remand is warranted so that the ALJ may fill the aforementioned gaps in the administrative record with medical opinion evidence relating the plaintiff's post-2018 medical treatment.[15]

### 2.    The ALJ's Adherence to the Regulations Governing Medical Opinion Evidence

While not explicitly argued by the plaintiff, the Court nevertheless further finds that remand is warranted because the ALJ did not adequately explain his consideration of both the "consistency" and "supportability" factors of the DDS prior administrative findings, specifically as they relate to the plaintiff's mental limitations.

The regulations governing medical opinion evidence demand that the ALJ explicitly consider the two "most important" persuasiveness factors of "supportability" and "consistency." *See* 20 C.F.R. § 416.920c(b)(2); *Glenn G. v. Kijakazi*, No. 3:22-CV-824 (RMS), 2023 WL 2477501, at *7 (D. Conn. Mar. 13, 2023) ("In her written decision, the ALJ must explicitly articulate how she considered the supportability and consistency factors") (internal quotation marks and citation omitted); *Verna M. v. Kijakazi*, No. 3:21-CV-1590 (MPS) (RMS), 2022 WL 17251764, at *13 (D. Conn. Nov. 28, 2022) ("On remand, the ALJ is to explicitly consider the

---

[15] The plaintiff also argues that the ALJ's decision to afford the prior DDS findings with significant weight is not supported by substantial evidence, insofar as DDS did not review the plaintiff's highly relevant post-2018 medical treatment records in connection with its findings.  (*See* Doc. No. 16-1 at 27).  As remand is already warranted due to the ALJ's failure to develop the record, the Court declines to evaluate whether the ALJ erred in affording significant weight to the prior DDS findings.

consistency and supportability factors of the medical opinion evidence and, in turn, the plaintiff's [RFC] determination and whether her RFC allows her to perform her past relevant work.").

Here, the ALJ's decision provides no mention or explanation as to how the ALJ addressed the "consistency" or "supportability" of the DDS prior administrative findings regarding the plaintiff's mental limitations, at either the initial or reconsideration levels. (*See* Tr. 24); *Rodriguez v. Kijakazi*, No. 21-CV-2358 (JCM), 2022 WL 3211684, at *11 (S.D.N.Y. Aug. 9, 2022) (explaining that "consistency concerns the degree to which the medical opinion is consistent with the other evidence in the record."). Rather, in describing the DDS findings as only "concluding that [the plaintiff] was capable of medium work," the ALJ addresses—at most—the "consistency" factor as it specifically relates to the plaintiff's *exertional* limitations. (Tr. 24). As such, the ALJ's assessment plainly does not speak to the "consistency" of the DDS findings as to the plaintiff's mental limitations, *i.e.*, the degree to which those findings are consistent with the other evidence in the record. *Rodriguez*, 2022 WL 3211684, at *11. Moreover, the ALJ's decision itself acknowledges the existence and utility of the various "mini mental status examinations" conducted during the plaintiff's various periods of incarceration, and upon his intake at the APT Foundation. (*See* Tr. 22–24). In other words, the Court finds that the record contains sufficient evidence pertaining to the plaintiff's mental limitations, and yet, the ALJ failed to evaluate the degree to which the DDS administrative findings were consistent with that evidence. Accordingly, the Court finds that remand is warranted and instructs that, on remand, the ALJ shall reassess the prior DDS administrative findings as to the plaintiff's mental limitations, in accordance with the regulations.

## C.    Remand for Further Administrative Proceedings Is Appropriate

While the plaintiff seeks an order reversing and remanding to the Commissioner for the payment of benefits (*see* Doc. No. 16-1), the Court declines to do so. "To award benefits, a district

court must find that, irrespective of the legal error, the record contains 'persuasive proof' of the claimant's disability and 'a remand for further evidentiary proceedings would serve no purpose.'" *Sonia N. B. A. v. Kijakazi*, No. 3:21-CV-709 (TOF), 2022 WL 2827640, at *10 (D. Conn. July 20, 2022) (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)).  The Court has reviewed the administrative record and finds that the plaintiff has not provided persuasive proof that, during the relevant time period, he was disabled.  Moreover, as described herein, there are outstanding issues that need to be resolved by the Commissioner.  As such, "[r]emand for calculation of benefits would [] be inappropriate." *Id.*  Therefore, the Court respectfully recommends that this matter be remanded to the Commissioner for further administrative proceedings consistent with this Recommended Ruling.

## VI.    **CONCLUSION**

For the foregoing reasons, the Court respectfully recommends that the plaintiff's motion for an order reversing or remanding the Commissioner's decision (Doc. No. 16) should be **GRANTED in part** and **DENIED in part** to the extent the plaintiff seeks remand for the payment of benefits, and the Commissioner's motion to affirm that decision (Doc. No. 18) should be **DENIED**.  On remand, the ALJ is instructed to: (a) articulate the specific reasons for any finding that the plaintiff's mental impairments fail to meet the "paragraph C" criteria for Listings 12.06 and 12.15; (b) solicit additional, more contemporaneous medical opinion evidence that incorporates the plaintiff's post-2018 medical treatment records; (c) evaluate the preexisting prior administrative filings (as well as any additional medical opinions) in accordance with the regulations governing medical opinion evidence; and (d) reformulate the plaintiff's RFC accordingly.

This is a recommended ruling.  *See* Fed. R. Civ. P. 72(b)(1).  Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen (14) days after filing of such order.  *See* D. Conn. L. Civ. R. 72.2(a).  Any party receiving notice or an order or recommended ruling from the Clerk by mail shall have five (5) additional days to file any objection.  *See* D. Conn. L. Civ. R. 72.2(a).  Failure to file a timely objection will preclude appellate review.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72; D. Conn. L. Civ. R. 72.2; *Impala v. United States Dept. of Justice*, 670 F. App'x 32 (2d Cir. 2016) (summary order) (failure to file timely objection to Magistrate Judge's recommended ruling will preclude further appeal to Second Circuit); *Small v. Sec'y of H.H.S.*, 892 F.2d 15 (2d Cir. 1989) (*per curiam*).

It is so ordered this 12th day of January, 2024, at New Haven, Connecticut.

 /s/ Robert M. Spector, U.S.M.J.
ROBERT M. SPECTOR
UNITED STATES MAGISTRATE JUDGE